## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| Elizabeth K. Blackmon | ) | |
| 16317 Sandy Ridge Court | ) | |
| Woodbridge, VA 22191, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Civil Action No.:_____ |
|  | ) | |
| WILLIAM BARR, Attorney General | ) | |
| U.S. DEPARMENT OF JUSTICE | ) | |
| 950 Pennsylvania Avenue, N.W. | ) | |
| Washington, DC 20530, | ) | |
|  | ) | |
| Defendant. | ) | |

---

### COMPLAINT

1.      Plaintiff Elizabeth Blackmon, by and through undersigned counsel, hereby files this action against Defendant United States Department of Justice (DOJ), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq*. ("ADEA"). Plaintiff seeks all remedies and relief available under Title VII, Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the ADEA, *e.g*., 29 U.S.C. § 626(b-c),for harms caused to Plaintiff by Defendant's unlawful discrimination on the basis of her prior protected EEO activity (retaliation) and age when Plaintiff was subjected to numerous harassing and discriminatory actions including the denial of opportunities to gain training, teach at conferences, and act in a supervisory role; the denial of applications for lateral positions that would have enhanced her career; unfairly low performance evaluations; a unfairly large workload; and the thwarting of career advancement in many ways.  Plaintiff requests as relief: equitable and injunctive relief, *e.g*.,

1

appropriate record correction with regard to Ms. Blackmon's lowered performance ratings; compensatory damages; non-compensatory damages; liquidated and compensatory damages under the ADEA; reasonable attorney fees, costs, and expenses; and such other relief as the Court deems just and appropriate in order to fully remedy Defendant's unlawful acts.

## PARTIES

2.      Plaintiff, Elizabeth K. Blackmon, is a United States citizen, and was a federal employee with approximately 20 years of service with the DOJ's Bureau of Prisons (BOP). From October 1991 to October 2011, she worked at BOP's Central Office Labor Management Relations Division in Washington D.C.

3.      Defendant William Barr is the United States Attorney General and is sued in his capacity as head of a department in the executive branch of the Federal Government within the meaning of 29 U.S.C. §§ 791 and 794.  Defendant's address is 950 Pennsylvania Avenue, N.W., Washington, DC 20530.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this Complaint because it presents a question of federal law.  28 U.S.C. § 1331.

5.      Specifically, this Court has jurisdiction over this Complaint pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3) and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*.

6.      This Court is the proper venue pursuant to 28 U.S.C. § 1391, 29 U.S.C. § 626(c), and 42 U.S.C. § 2000e-5(f)(3).  Plaintiff's office was located in Washington, D.C., her supervisors were located in Washington, D.C., and most or all of the unlawful employment practices alleged to have been committed occurred in Washington, D.C.

7.      Plaintiff has exhausted the administrative process for her claims in a timely manner. Plaintiff timely filed and pursued an Equal Employment Opportunity (EEO) complaint within the BOP's administrative process, although BOP failed to investigate the complaint until over a year and three months after the filing of her formal EEO complaint and approximately seven months after she requested a hearing with the EEOC, in contravention of federal regulations.  Plaintiff timely filed and pursued a case at the Equal Employment Opportunity Commission (EEOC), for which an acknowledgment order was issued on March 19, 2013 and a dismissal order was issued on September 28, 2020.  There was no discovery conducted and no hearing in this case.  After notifying the EEOC administrative judge on September 16, 2020 of her intention to file her complaint in U.S. District Court and withdraw her hearing request at the EEOC, the EEOC administrative judge issued an Order of Dismissal on September 18, 2020, advising the Agency to issue the final decision within 60 days pursuant to 29 C.F.R. §1614.110(b), i.e., by November 17, 2020.  By November 17, 2020, BOP should have issued a final decision describing Plaintiff's right to file a case in federal court within 90 days, which would have been approximately February 15, 2021 if the final decision was issued on November 17, 2020.  However, BOP failed to issue a final decision noting Ms. Blackmon of her rights.  Instead, BOP issued a letter on October 8, 2020, noting the closure of the administrative EEO file based on the administrative judge's dismissal order.  (BOP falsely noted that the EEOC's Order dismissed the EEO complaint "because you have filed a federal complaint in federal district court on the same issues as those raised in your administrative complaint.")  Although BOP failed to follow the administrative judge's instructions or comply with the applicable regulations, the administrative file has been closed, and thus Plaintiff is timely pursuing her case in U.S. District Court, even though BOP failed to advise her of her right to do so in its closure letter.

3

## FACTS

8.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

9.     Plaintiff Elizabeth Blackmon joined the Department of Justice's Bureau of Prisons (BOP) in October 1991. Ms. Blackmon left BOP in October 2011, due to ongoing discrimination and retaliation.

10.     Ms. Blackmon brought discrimination claims at BOP, which were investigated in 2012, and which covered discriminatory events occurring from 2007 to October 2011 (the relevant time period for Plaintiff's discrimination claims).  During this time period, Plaintiff served as a Labor-Management Relations ("LMR") Specialist.  LMR Specialists provided management with advice and guidance about disciplinary and adverse actions and performance issues, and represented BOP in third party hearings (MSPB hearings and arbitrations).

11.     Ms. Blackmon is female and was born in 1966.

12.     Docia Casillas served as Plaintiff's immediate supervisor during the relevant time period until Ms. Casillas left the Agency in or around April 2010. Ms. Casillas was born in 1960.

13.     Thereafter, Chung-Hi Yoder took over as Plaintiff's immediate supervisor from in or around July 2010 until Plaintiff left the Agency in October 2011. Ms. Yoder was born in 1969.

14.     Christopher Wade served as the Deputy Chief of LMR and as Plaintiff's second-line supervisor during the relevant time period. Mr. Wade was born in 1961.

15.     Cristina Griffith served as Chief of LMR and as Plaintiff's third-line supervisor during the relevant time period until around December 2009. Ms. Griffith was born in 1969.

16.     Thereafter, Joey Meade took over as the Chief of LMR as well as Plaintiff's third-line supervisor until his retirement from the Agency in or around May 2011. Mr. Meade was born in 1960.

17.     Following Mr. Meade's retirement, Paul Layer assumed the position as Chief of LMR as well as Plaintiff's third-line supervisor until Plaintiff left the Agency in October 2011. Mr. Layer was born in 1962.

18.     In or around November 2007, Ms. Blackmon met with an EEO counselor regarding a non-selection for a Diversity Management Administrator position.   Ms. Blackmon attempted to resolve the complaint via alternate dispute resolution ("ADR") and participated in a mediation in December 2007.

19.     Ms. Blackmon never pursued a formal EEO complaint as a result of threats that she received concerning her and her husband's jobs by then-Deputy Assistant Director of Human Resources Juan Castillo, if she pursued a discrimination complaint at BOP. (Plaintiff's husband was also an Agency employee.)  Mr. Castillo warned Ms. Blackmon that she would ruin her and her husband's career if she pursued an EEO complaint against BOP.  Ms. Blackmon reported this violation of EEO law to the EEO Officer but did not pursue a formal EEO complaint due to Mr. Castillo's threats and warnings.

20.     Plaintiff's supervisors Christina Murphy-Griffith and Christopher Wade were well aware of her protected EEO activity in late 2007 (EEO counseling and participation in ADR).

21.   From 2008 until October 2011, when she left BOP, Ms. Blackmon was subjected to a hostile work environment and reprisal by her supervisors.

22.   Aside from the rigorous duties that Plaintiff was tasked with through her role as a LMR Specialist, she was also made responsible for the workload of three to five people beginning in or around January 2008. This included work as the Management Analyst who was responsible to serve as the Reasonable Accommodations Coordinator, preparing all LMR quarterly meetings reports, managing the Home Duty processing, tracking policies, reviewing disciplinary letters, managing the Abacus database, and ranking arbitration panels.  None of the other LMR Specialists were required to perform the additional duties that Ms. Blackmon performed.  Ms. Blackmon received no additional credit or points for her additional work on her performance evaluations; rather, her evaluations were lowered.

23.   Gail Elkins, an attorney in the LMR office who shared an office space with Ms. Blackmon, stated something to the effect of Plaintiff having "an extremely heavy work load from what I could tell. She was always working from the time we got here until the time she left during the day every day. I know that sometimes she became very upset about that work load and would talk about it, at the point that sometimes she would be in tears because it was according to her too much. I think it was a lot quite frankly . . . ."

24.   Shemika Abraham, an Administrative Officer and later an Employees Relations Specialist within LMR, stated that Plaintiff "was extremely busy and to me looked stressed out all the time because she was so busy. . . . [S]he did seem to be busier than everybody else because she was juggling so many different duties. . . . [T]o be honest I don't know how she did it plus her case load that she did. Because the volume of work

that I get currently in my position plus getting those additional duties can be very overwhelming, and I was only doing about 10% of what she had to do." Ms. Abraham did not handle arbitrations or MSPB hearings, like Ms. Blackmon.

25.     Beginning in or around March 2009, Ms. Blackmon was also tasked with submitting reports which detailed her work history for the day down to the minute by her then-immediate supervisor, Ms. Casillas. Upon information and belief, no other LMR Specialist was expected to complete similar reports.

26.     On or about March 16, 2009, Ms. Casillas sent Ms. Blackmon an e-mail which informally placed Plaintiff on a Performance Improvement Plan ("PIP") despite Ms. Blackmon having exhibited no issues with her performance.

27.     Despite being responsible for various, additional duties, Ms. Blackmon received performance evaluations which did not adequately reflect her workload and accomplishments.

28.     Prior to Ms. Blackmon joining LMR, she consistently received outstanding performance evaluations and awards. Ms. Blackmon also previously received the "Employee of the Year" recognition and had maximum points for awards until she brought an informal EEO complaint at LMR.

29.     Specifically, in or around April 2009, Plaintiff's then-immediate supervisor, Ms. Casillas, issued Plaintiff a "fully satisfactory" rating, the middle ranking between "unsatisfactory" and "outstanding." Plaintiff expressed to Ms. Casillas and then-Chief Ms. Griffith her concern with the rating.

30.     In or around July 2009, Ms. Blackmon again contacted an EEO counselor as a result of the unfavorable performance evaluation as well as her knowledge that another

employee that had not made any significant contributions to the office had received a higher rating than Ms. Blackmon. However, due to Plaintiff's continuous fear of retaliation, she did not pursue a formal EEO complaint at that time.

31.    In or around October 2009, Ms. Griffith ordered Blackberry cellphones for all Specialists in the office but excluded Plaintiff. Ms. Griffith sent out an email wherein she stated "all Specialists in each office, EXCEPT for Liz [Blackmon]…"

32.    When Mr. Meade discovered Plaintiff did not have a Blackberry, he instructed Plaintiff to get one. Plaintiff began the process in or about June 2010. It took Plaintiff approximately two months to acquire one, although the process should have taken less than one week.

33.    In or around July 2010, Ms. Blackmon spoke with Mr. Meade, then Chief of LMR, regarding her evaluation and was told that he had instructed his Deputy, Mr. Wade, to correct the evaluation.  Later, she expressed to Mr. Meade that Mr. Wade had yet to make the changes to her performance evaluation. Mr. Meade informed Ms. Blackmon that he would be discussing the issue with Mr. Wade.

34.    A second unfair rating came in or around November 2010 when Ms. Blackmon was again rated "satisfactory." After Ms. Blackmon discussed her concerns with her supervisor, the rating was increased one step to "Exceeds." However, Ms. Blackmon believed she was entitled to a rating of "outstanding" given her heavy workload and success on her cases.

35.    On or about September 1, 2010, Mr. Wade had yet to change the evaluations. Plaintiff sent an e-mail to Mr. Wade to this effect.

36.     As of September 17, 2010, Mr. Wade failed to even open Plaintiff's e-mail. Plaintiff then forwarded this information to Mr. Meade and Ms. Yoder.

37.     On or about December 17, 2010, the changes to Plaintiff's evaluations were still not made. Plaintiff sent an e-mail to Ms. Yoder and Mr. Wade to this effect. Ms. Yoder only advised that Plaintiff speak with Mr. Wade.

38.     Upon information and belief, Mr. Wade was refusing to correct Plaintiff's evaluations and Mr. Meade never confirmed that the corrections were made.

39.     Despite Plaintiff's heavy workload, she successfully represented the Agency in over one hundred (188) Merit Systems Protection Board ("MSPB")/Arbitration hearings and appeals during the relevant period, amounting to approximately 7% of the entire office's caseload. Many of these cases were high-profile and could have cost the agency hundreds of thousands of dollars. Further, Ms. Blackmon was one of the only Specialists to win a meal break case and/or contingency plan case.

40.     Plaintiff's work gained the favorable attention of the Associate General Counsel for the U.S. Marshals Services in or around December 2009 and the Chief of the Human Relations at the State Department. Ms. Blackmon brought these accomplishments to her supervisors' attentions, but they refused to acknowledge her work or amend the performance evaluations to reflect this.

41.     Due to the unfavorable evaluations and lack of awards in her record (which equate to points which are used for promotional processes), Ms. Blackmon had been passed over for numerous positions as she could not make the Best Qualified ("BQ") list following her involvement in the EEO process, despite her high qualifications and competitive application packet.

42.     For instance, Ms. Blackmon was not selected for the position of CO-2010-0208 - Management Analyst - GS-0006-13.[1] This position was with the External Auditing Branch and would involve communicating with various agencies (inside and out of the Department of Justice), with very high visibility. Although it was a lateral vacancy, it would have realistically prepared Ms. Blackmon for promotions within the FBOP and/or other agencies due to the high visibility and networking.

43.     Further, Ms. Blackmon was not selected for the position of CO-2010-0308 - Regional Re-Entry Affairs Coordinator - GS-0101-12/13. This would have given Ms. Blackmon numerous opportunities for advancement and visibility, as it was expanding throughout the Agency and also was related to Correctional Services which is the primary mission of the Federal Bureau of Prisons. Ms. Blackmon would have communicated both orally and in writing with various leaders of the agency, providing opportunities to expand career options.

44.     Further, Ms. Blackmon was not selected for the position of CO-2010-0407 - Correctional Program Specialist (Special Agent) - GS-0006-13. This position is had high visibility and would have been career enhancing as it would have involved communication throughout the BOP and the Department of Justice.   As it was a Special Agent, it would have also provided an opportunity for growth and advancement outside of BOP, with other law enforcement agencies.  Ms. Blackmon would have

---

[1] Plaintiff is a class agent in the Turner Class Action, Turner v. DOJ, EEOC No. 541-2016-00016X, which is pending at the EEOC. This class action covers Ms. Blackmon's non-promotion claims based on retaliation, and thus, the non-selection claims that Ms. Blackmon is raising in this Complaint are for lateral positions, not promotions.

communicated both orally and in writing with various leaders of the agency, providing opportunities to expand career options.

45.     Further, Ms. Blackmon was not selected for the position of CO-2010-0566 - Correctional Program Specialist - GS-0006-13. This position was in the Privatization Branch and would very have assisted Ms. Blackmon with moving to higher level positions.  The position had very high visibility and was more involved in Correctional Programs, which is the primary mission of the Federal Bureau of Prisons.  Privatization has also greatly expanded and has had very high visibility, which enhances career advancement.  Ms. Blackmon would have communicated both orally and in writing with various leaders of the agency, providing opportunities to expand career options.

46.     Further, Ms. Blackmon was not selected for the position of CO-2011-0263 - Correctional Programs Specialist (Inmate Skills Development Coordinator) - GS-0006-12/13.  This is another position in Correctional Programs with high visibility and more opportunities for career advancement as it involved developing and evaluating inmate training Bureau-wide.

47.     Further, Ms. Blackmon was not selected for the position of CO-2011-0006 - HRS Evaluation Specialist - GS-13. This would have been a great opportunity for Ms. Blackmon, in terms of visibility and advancement, as she would be involved with Wardens and Regional Directors throughout BOP, in maintaining the highest Correctional Standards.  Ms. Blackmon would have communicated both orally and in writing with various leaders of BOP, providing opportunities to expand career options.  This job

announcement was cancelled, and then Karen LaForest was reassigned into the position without a job announcement.

48.     Due to Plaintiff's heavy workload in the relevant time period, Plaintiff was denied the opportunity to participate in development and/or training opportunities despite her requests to do so. Some of these opportunities included teaching at the National Advocacy Center ("NAC") and the Regional Office as well as participating as a reviewer with the Program Review Office. Alvin Calhoun and Viveca Simmons were allowed to assist with Program Review, and both were promoted out of the office.

49.     On or about February 25, 2011, Jana Gill, the Human Resource Administrator from the Mid-Atlantic Regional Office, requested that Plaintiff teach Principles of Leadership the week of April 4-8, 2011. Ms. Gill, in her email to Mr. Meade requesting Plaintiff's participation, stated something to the effect of, "She taught the class for us in September of 2010 and did a great job."

50.     Ms. Blackmon attempted to discuss the opportunity with Mr. Meade on several occasions, but Mr. Meade never responded. Rather, Ms. Yoder was charged with coordinating who was to teach. It was not until on or about March 30, 2011, one week before the event, that Ms. Yoder informed Plaintiff something to the effect of, "In light of your expressed concerns regarding your workload, I am making other arrangements for the training."

51.     Plaintiff taught Instructor Skills Training as an Employee Development Specialist for several years and had taught Central Office Classes and also served as a Regional Diversity Instructor.  Plaintiff also assisted in the development of the Agency-wide diversity management training.

52.     Upon information and belief, other employees were also allowed to participate in these various developmental/training opportunities and as a result, received more favorable performance evaluations (and promotions). Some of these employees include Alvin Calhoun and Viveca Simmons.

53.     Robin Suzanne Courtney ("Ms. Courtney"), an attorney in the LMR office during the relevant period, acknowledged that Ms. Simmons' caseload appeared noticeably less than that of Plaintiff's and did not include all of the additional duties assigned to Plaintiff.

54.     Upon information and belief, from in or around January 2008 until in or around March 2011, Ms. Simmons closed twenty-six (26) cases while Plaintiff closed 188.

55.     From in or around 2009 until Plaintiff's departure in or around October 2011, Plaintiff was required to work in a small area and was consistently denied the first choice at offices she requested.

56.     Upon information and belief, first choice is generally given to the most senior employee who requests the space.  Although first preference for vacant office space was given by seniority, Plaintiff was the most senior of the specialists in the office and was not given any preference.

57.     In or around early 2011, with only about two years at the Agency at the time compared to Plaintiff's twenty years, Beth Reese, a new, younger employee, was given the office that Plaintiff had requested. In or around the summer of 2011, a younger intern was also given an office over Plaintiff.

58.     Ms. Abraham stated that Plaintiff "requested several times to be moved from the small office she was in. And she was also told by management that they would

look into it. Then when I got the position I am currently in they moved me into an office where possible [sic] she could have, well actually there was three offices open and she wasn't allowed to move to any of those offices. . . . I've always known that most of the time they look at seniority. . . . But I know she [Plaintiff] had more seniority than me and I had an office by myself. A lot bigger space then [sic] she had and I thought that was very odd."

59.     When Plaintiff would request assistance or time to work on her assignments, she was questioned, given a difficult time, and/or required to justify her request. If Plaintiff was given additional time, it would only be for a day or so, which was never enough time to get caught up on her workload.

60.     Upon information and belief, Ms. Blackmon's colleagues were often out of the regular rotation and were allowed adequate time to catch up on work as needed, despite not having as significant of a caseload as Ms. Blackmon.

61.     Due to the continuing hostile work environment that Plaintiff experienced, Plaintiff complained to her then-immediate supervisor, Ms. Yoder, on numerous occasions. Ms. Yoder informed Plaintiff that the only answer would be for Plaintiff to leave the LMR office and that Ms. Yoder would support her leaving.

62.     In or around March 2011 when a vacancy arose that Plaintiff could fill, she spoke with Ms. Yoder who sounded very excited about the potential move. Plaintiff sent Ms. Yoder the vacancy announcement, who then forwarded it to someone else. Ms. Yoder replied several hours later with an upset tone something to the effect of, "I certainly encourage you to apply for any position you feel you are interested in and qualified for."

63.     Plaintiff was held responsible for her tasks, such as Home Duty Requests, even when she was out of the office or on leave.

64.     For example, Plaintiff's husband had very serious medical issues in or around January 2009, requiring Plaintiff to be in the emergency room many nights and to take leave. Upon Plaintiff's return from leave, she noticed a Home Duty Request had come in during her absence and took care of it immediately. Following this, Ms. Griffith called a meeting with Mr. Wade and Plaintiff's immediate supervisor at the time, Ms. Casillas, to discuss the late submission. Mr. Wade attempted to discredit and blame Plaintiff for the tardiness despite knowing she was on leave.

65.     Another example was when Plaintiff came into the office to get a report out and was questioned in a hostile manner regarding other duties she was unable to complete while on emergency leave, bringing Plaintiff to tears. Upon information and belief, Ms. Elkins observed this.

66.     Plaintiff was held responsible and blamed on at least two other occasions for her inability to respond to Home Duty Requests during other leave.

67.     In or around the first week of March 2011, Ms. Blackmon was harassed when she was representing the DOJ at a hearing. Prior to her departure, Plaintiff contacted Ms. Yoder to remind her of Plaintiff's absence. Ms. Yoder assured Plaintiff that the acting supervisor, Tiffany Lee, would handle any requests during that time. Two requests came in and were unattended to while Plaintiff was at the hearing that Ms. Yoder questioned and attempted to hold Plaintiff accountable for.

68.     Ms. Abraham, who was later assigned Plaintiff's duties in relation to Home Duty Requests, stated that "at the point that the home duty is about to expire the supervisor is responsible for insuring that it gets to where it needs to go for signature."

69.     Amina Coffee, an Administrative Officer within LMR, was aware that Plaintiff had a procedure typed up of what to do in her absence regarding Home Duty Requests.

70.     It was not until in or around January through March 2011 that the Agency began redistributing Plaintiff's additional duties. Afterwards, the duties that Plaintiff was solely responsible and held accountable for, aside from her own duties, have been shared with at least four other employees: Ms. Coffee, Ms. Abraham, Janel Brown, and Liz Nagy.

71.     During the relevant period, Plaintiff was the second-most senior employee in the LMR office. At the time, she had almost twenty years with the Agency, over six years in the LMR office, over twenty-three years of Federal government service, and was a disabled veteran. Plaintiff trained almost all of the attorneys in the LMR office as well as numerous specialists. Plaintiff also had field experience from working several institutions and offices prior to LMR.

72.     Despite her seniority, Plaintiff was consistently denied the opportunity to serve as acting supervisor during a supervisor's absence. Rather, supervisors would select much less qualified employees to act.

73.     Ms. Yoder attempted to cancel Plaintiff's leave to act, despite her seniority, only when no one else was available during Christmas season in 2010.

74.     Since Ms. Reese joined LMR in or around November 2008, Plaintiff was given several of her cases although Ms. Reese's caseload was generally less than that of Plaintiff.

75.     Specifically, on or about January 25, 2011, Plaintiff was assigned another one of Ms. Reese's cases. Plaintiff requested that the case be re-assigned back to Ms. Reese. Plaintiff's request was denied although at the time, Ms. Reese had twenty cases compared to Plaintiff having twenty-eight cases, along with her additional duties.

76.     On or about April 4, 2011, Plaintiff determined that since Ms. Reese's arrival to LMR, she had represented the Agency in twenty-nine (29) cases. During the same timeframe, Plaintiff represented the Agency in eighty-eight (88) cases on top of the additional work of other positions that had only recently been divided.

77.     For a time, Ms. Blackmon was completely responsible for the Reasonable Accommodation Program and along with several attorneys, had revamped the program to ensure compliance with EEOC regulations.  Ms. Blackmon performed these duties in addition to her other duties.  Ultimately, the Agency created a GS-15 position to handle these duties and Ms. Blackmon was not able to apply or compete for the position.

78.     On or about March 29, 2011, Plaintiff filed a formal EEO complaint which serves as the basis for this action.

79.     Since Plaintiff's supervisors became aware of Plaintiff's complaint starting in late 2007, they have become even more hostile and retaliatory towards Plaintiff.

80.     Plaintiff's supervisors stopped Plaintiff from communicating with the Assistant Director's office and the Justice Management Division.

81.     For example, even prior to relieving Plaintiff of her Home Duty responsibilities which required contact with both offices, she was no longer allowed to answer questions directly as she had done for the past three years. Rather, she was told that the acting supervisor would respond.

82.     Ms. Yoder began sending courtesy copy ("CC") emails of almost all correspondence to Plaintiff to Mr. Wade and Mr. Meade (and then Mr. Layer when he took over as Chief).

83.     Plaintiff was also denied the opportunity to attend the Leadership, Excellence and Achievement Program ("LEAP") training. Plaintiff sent an e-mail to Ms. Yoder on or about March 25, 2011, inquiring about attending and Ms. Yoder, despite reading Plaintiff's message, never responded to Plaintiff's request.

84.     Ms. Yoder unreasonably questioned Plaintiff regarding her telework. Upon information and belief, all other LMR employees teleworked but were not questioned about their productivity as Plaintiff was.

85.     In or around May 2011, Plaintiff was not allowed to participate in LMR quarterly meetings. Plaintiff had attended these meetings since 2008. Plaintiff inquired into her attendance and management never responded.

86.     Upon information and belief, the Agency sent Michael Markiewicz ("Mr. Markiewicz"), another LMR Specialist, in Plaintiff's place to the meeting held in Seattle, Washington who simply attended the meeting as opposed to taking and distributing minute notes and handling the coordination with management and the union as Plaintiff did previously.

87.     Upon information and belief, Ms. Griffith, Ms. Yoder, Ms. Courtney, Ms. Reese, Ms. Abraham, and Ms. Lee were younger than Ms. Blackmon. In contract to the discriminatory treatment of Ms. Blackmon, they were promoted or otherwise permitted to transfer out of LMR as well as given better evaluations, not given as heavy of workloads, and were treated better overall.

88.     As a result of the ongoing harassment and retaliation, Plaintiff left the Agency in or around October 2011.

89.     As a result of Defendant's discriminatory actions, Plaintiff suffered from emotional harm, physical manifestation of emotional harm, professional embarrassment, and damage to her career and reputation.

## CAUSES OF ACTION

### COUNT I

### DISCRIMINATION BASED ON PRIOR EEO ACTIVITY IN VIOLATION OF TITLE VII (REPRISAL)

### (DISPARATE TREATMENT)

90.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

91.     Plaintiff was, at all times relevant herein, an employee of Defendant within the meaning of Title VII (42 U.S.C. § 2000e *et seq*.).

92.     At all times relevant herein, Defendant was Plaintiff's employer within the meaning of Title VII (42 U.S.C. § 2000e *et seq*.).

93.     Title VII of the Civil Rights Act prohibits employment practices that discriminate against Plaintiff on the basis of her prior EEO activity.  Plaintiff has been the victim of unlawful discriminatory conduct in the workplace.

94.     Plaintiff is a member of a protected class.

95.     Plaintiff was qualified in her position at BOP.

96.     Plaintiff was unlawfully and intentionally subjected to disparate treatment and was subjected to adverse employment actions as a result of her prior EEO activity.  Defendant's agents and employees took materially adverse actions against Plaintiff, including, but not limited to, subjecting her to discriminatory non-selections and unfairly low performance evaluations.

97.     Similarly situated employees without EEO activity were treated more favorably and not subjected to these actions.

98.     Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Ms. Blackmon's right to be free from discrimination based on prior EEO activity.

99.     As a direct, legal, and proximate result of the discrimination, Ms. Blackmon has sustained, and will continue to sustain, emotional injuries, and damage to her reputation and career, resulting in damages in an amount to be proven at trial.

**COUNT II**

**DISCRIMINATION BASED ON PRIOR EEO ACTIVITY
IN VIOLATION OF TITLE VII (REPRISAL)**

**(HOSTILE WORK ENVIRONMENT)**

100.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

101.     Plaintiff was subjected to a hostile working environment by Defendant's agents and employees, due to her prior EEO activity.   The discriminatory conduct included denying opportunities to Plaintiff that were made available to similarly-situated coworkers, thwarting her

career advancement, subjecting her to a massive workload, and subjecting her to many harassing actions as described in this Complaint.

102.    Through the aforementioned acts, Defendant subjected Plaintiff to a severe or pervasive hostile working environment, discriminated against Ms. Blackmon, and denied her equal terms and conditions of employment.

103.    The conduct was so severe or pervasive that a reasonable person in Ms. Blackmon's position would find her work environment to be hostile or abusive.

104.    Ms. Blackmon believed the work environment to be hostile or abusive as a result of Defendant's agents' and employees' conduct.

105.    Management-level employees knew, or should have known, of the hostile or abusive conduct because such employees were the ones who engaged in the unlawful conduct. Moreover, Ms. Blackmon had made complaints to such employees regarding the hostile or abusive conduct.

106.    Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Ms. Blackmon's right to be free from discrimination based on prior EEO activity.

107.    As a result of the aforementioned acts, Defendant violated Plaintiff's right to be free from a hostile work environment, pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*.

108.    As a direct, legal and proximate result of the discrimination, Ms. Blackmon has sustained, and will continue to sustain, economic and emotional injuries, and damage to her reputation and career resulting in damages in an amount to be proven at trial.

## COUNT III

### DISCRIMINATION BASED ON AGE IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

### (DISPARATE TREATMENT)

109.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

110.    Based upon the facts described in the preceding paragraphs, Defendant unlawfully discriminated against Plaintiff on the basis of her age (born in 1966) in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621 *et seq*.

111.    Plaintiff is a member of a protected class.

112.    Plaintiff was qualified in her position at BOP.

113.    Plaintiff was unlawfully and intentionally subjected to disparate treatment and was subjected to adverse employment actions as a result of her age.  Defendant's agents and employees took materially adverse actions against Plaintiff, including, but not limited to, subjecting her to discriminatory non-selections and unfairly low performance evaluations.

114.    Younger, similarly situated employees were treated more favorably and not subjected to these actions.

115.    Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Ms. Blackmon's right to be free from discrimination based on her age.

116.    As a direct, legal, and proximate result of the discrimination, Ms. Blackmon has sustained, and will continue to sustain, emotional injuries, and damage to her reputation and career, resulting in damages in an amount to be proven at trial.

**COUNT IV**

**DISCRIMINATION BASED ON AGE IN VIOLATION OF THE AGE
DISCRIMINATION IN EMPLOYMENT ACT**

**(HOSTILE WORK ENVIRONMENT)**

117.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

118.    Plaintiff was subjected to a hostile working environment by Defendant's agents and employees, due to her age.  The discriminatory conduct included denying opportunities to Plaintiff that were made available to similarly-situated, younger coworkers, thwarting her career advancement, subjecting her to a massive workload, and subjecting her to many harassing actions as described in this Complaint.

119.    Through the aforementioned acts, Defendant subjected Plaintiff to a severe or pervasive hostile working environment, discriminated against Ms. Blackmon, and denied her equal terms and conditions of employment.

120.    The conduct was so severe or pervasive that a reasonable person in Ms. Blackmon's position would find her work environment to be hostile or abusive.

121.    Ms. Blackmon believed the work environment to be hostile or abusive as a result of Defendant's agents' and employees' conduct.

122.    Management-level employees knew, or should have known, of the hostile or abusive conduct because such employees were the ones who engaged in the unlawful conduct. Moreover, Ms. Blackmon had made complaints to such employees regarding the hostile or abusive conduct.

123.    Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Ms. Blackmon's right to be free from discrimination based on age.

124.    As a result of the aforementioned acts, Defendant violated Plaintiff's right to be free from a hostile work environment, pursuant to the ADEA.

125.    As a direct, legal and proximate result of the discrimination, Ms. Blackmon has sustained, and will continue to sustain, economic and emotional injuries, and damage to her reputation and career resulting in damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

126.    Plaintiff requests the following relief:

a.      Equitable and injunctive relief, *e.g.*, appropriate record correction with regard to Ms. Blackmon's lowered performance ratings, pursuant to Title VII and the ADEA;

b.      Maximum compensatory damages and non-compensatory damages to which Plaintiff is entitled after proof at trial, pursuant to Title VII;

c.      Liquidated damages, compensatory damages, and any other damages to which Plaintiff is entitled after proof at trial, pursuant to the ADEA;

d.      Reasonable attorney fees, costs, and expenses of this action and Plaintiff's predecessor administrative complaint; and

e.      Such other relief as the Court deems just and appropriate.

## JURY DEMAND

127.    Plaintiff demands a trial by jury on all of her claims.

Respectfully submitted,

*Daniel K. Gebhardt*

Daniel K. Gebhardt
(D.C. Bar No. 975703)
SOLOMON LAW FIRM, PLLC
1025 Connecticut Avenue, N.W., Suite 1000
Washington, DC 20036

24

Tel.    866-833-3529
Fax.    202-688-1896
dgebhardt@fedemploylaw.com

January 6, 2021                    Attorneys for Plaintiff